The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw not and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Ms. Phillips? Good morning, Your Honors, and may it please the Court. Ordinarily, I would jump right into the legal issue in this case, but I think the extraordinary outcome in the decision below warrants at least a slight framing of what is not before the Court in this particular case. So we have a $30 million damages determination based on a $150,000 engagement by an independent trustee in which there is no finding of bad faith, no finding of any collusion among the parties, no finding of any self-dealing, no conflicts of interest, no breach of fiduciary duty being alleged. There is no violation of any Department of Labor regulation, and indeed in 40 years the Department of Labor has still failed to identify a single regulation defining what is adequate consideration under ERISA. And there is no allegation of a departure from a professional standard of conduct, and indeed the only evidence of professional standards in this case is the amicus brief which was filed by the American Society of Appraisers, whose assessment of the appraisal that was done by SRR in this case is that it complied with all of those requirements. Nonetheless, we're here in a situation in which a very extraordinary damages remedy has been imposed. I suggest to you that the problem here is that the district court, instead of identifying any of the criteria that might justify a significant award, went off on a very different approach and one that I would hope that this court would discourage because its only effect will be to in fact deter independent trustees from engaging in this kind of business, appraisers from engaging in this kind of business, and ESOPs being created in the future. And indeed it's important to keep that part in mind because Congress was very clear that it wanted to encourage the creation of ESOPs because of the opportunities they present under ERISA for protecting both employers and employees. Well, the district court made findings that Wilmington had failed to prove the plan paid fair market for it. That's a finding in the record. What's wrong with this finding? Well, it fails, I think, to deal with the clear evidence that's uncontested in this case. Whereas the very best evidence in the case, candidly, as to the fair market value, is the sale of exactly this company seven months after the ESOP was created to the Academy Corporation. Well, I think there's substantial evidence in the record, whether you're going to credit it or not, that in fact it wasn't an identical price. So a lot of things had happened to the asset that made it worth less, and yet they got the same price for it. Things had happened after the ESOP transaction that made the price go down, but nevertheless they sold it at a much higher price. Which all that suggests is that the appraisal estimate, the range, was a reasonable estimate for the fair market value of this particular company. Can you tell me how much time elapsed between the date that Wilmington received the draft valuation and the conclusion of negotiations? You mean the very first draft? SRR's draft valuation. I thought it was on November 12th. Is that correct? Yes, that is correct. And the conclusion of negotiations were on November 13th? That's correct. And can you speak as an expert to us in representing companies like this? Is this typical? It's not atypical. What we know from the record is that the time that was available to the expert, to the appraiser, was well within the bounds of what they ordinarily experience. It shouldn't come as a huge surprise. Well, maybe you can help me with the valuation. It looked to me like both sides that were negotiating with each other knew about the valuation that they received. Is that correct? You know the range? Yes. And that's typical? I don't think it's atypical. I mean, obviously, if you think about it, you're talking about the company, the sellers, right? They know the business better than the sellers and what they think the value of it is. But I thought the trustee was to the whole purpose was to set up something that was separate and apart from the company to negotiate with the company. Right, but the point, I mean, the company had its view of the value. If you all have all the information, you know, in usual negotiations, one side has their experts, and that's, in fact, what happened at trial. Right, they did. Both sides did have their experts. They had their experts also with respect to valuation. But it seemed here that the trustee made everything an open book. I believe that given that the appraiser's assessment was based in part on the projections from the company itself, which is exactly the same way appraisals were done in the McLean sale and in the Academy sale, it's not a surprise that you would have a pretty good sense of what the value of the company is. And so they came in with a value. I hear you on that, and I think that's a fair comment. But here we had the negotiations that looked like one side was working off of and taking advantage of the negotiations, and the trustee was not trying to take advantage of those, were its client. Well, what we do know is that the trustee began the negotiations at the lowest end of the range of fair market value and then negotiated up as you would expect. And the company began its negotiations? At the high end of the range. I think beyond the range. Barely, but fairly. And the company and the trustee didn't do it at the lowest part of the range. Remember, there's the testimony about they wanted to be taken seriously. Right, because if you come in with too far down below a certain range, obviously the other side may walk away. Everybody knows that's part of the bargaining. But the whole thing was set up so that there would be a sale. The company wanted there to be a sale. So the trustee's view that the company would walk away if it came in with too low evaluation to begin with, just doesn't, you can understand why the district court wouldn't find that credible. That's fine. And if the district court's criticism is that, first of all, I think the whole idea that you would second guess how an independent trustee engages in negotiation is really proper. But even if you accept that, what is the consequence of those negotiations? We still have, to my mind, an unassailable estimate, appraisal, value of the value of this company. And we ended up inside that. But this is all about procedure, isn't it? I mean, this whole argument is about procedure, whether the trustee acted properly, whether he acted as a trustee. That's all we're concerned with. Right. Well, I hope that's true because I don't think that's how the district judge looked at it. Okay. Because I think that, I mean, to be sure, the district judge criticized the method of negotiation. But to me, the biggest part of the decision by the district court, the part I would ask the court to really focus on in a totality of the circumstances, is the determination of what effect to give to the controlling aspects of owning 100 percent of the voting shares of the stock. The issue there is not a factual dispute. They do, in fact, have 100 percent, they control 100 percent of the voting shares. And the district court basically said that was useless. That was the same as owning a single share. It's clearly not the same as owning all aspects of ownership because they weren't entitled to a majority of the board. But they did have the ultimate voting share. And for that, they received, under the appraisal, a 10 percent premium. And the district judge simply dismissed that premium out of hand. And we don't know. You can't now know what effect it would be if this court were to say, no, that's not your province. You don't have the authority to second-guess both the professional appraiser and the independent trustee's judgment that there is, in fact, some significant control value. And that's particularly true in this case where we know, first of all, they used the control value to significantly improve the indemnification against the audit. They used the control value to ensure that they got representations and guarantees from the sellers to protect the underlying transaction in this case. They used the control value to obtain $20 million in cash for the ESOP. In this particular case, they used the control value to obtain immediate vesting. The control value obviously had the control power had huge value to the ESOP and to the court in this case. And yet the district court dismissed that. And I say to you that you can't simply dismiss that. So the district court relied on Messina's testimony, right? Yes, Judge. And did you – and I understand you weren't trial counsel, but you know how it is. You take the case. It's yours now. So did your – did the trustee put in or did that side put in an expert that also made valuation? Yes. I had not read that, and I had thought that the district court said that was not so, that your expert expressly testified that he wasn't engaged to do evaluation. No, I apologize. He did an assessment of whether or not – He did sort of a critique of Messina. Yes, which was, of course, the same – in effect, the same thing Messina did. Messina did a critique of the valuation that was done himself. And, indeed, the district court found that his critique was very poorly explained and not very well thought of and, therefore, dismissed at least a half of it out of hand and then decided, nevertheless, notwithstanding the lack of substance to Messina's critique, to use it as a basis for averaging between the valuation of the defendant and the valuation that Messina put forward. We didn't – so we didn't do a separate valuation. We relied upon the SRR valuation and the quality of that that we had relied upon. Did you offer the district court an alternative damages calculation? No, because – Or a failure to supply, lack of control, discount? No, we did not do a separate analysis of each of the hodgepodge factors and the totality of the circumstance. Isn't there something to the fact that you've waived that argument now? No, because if you can't take out – first of all, there's a question – it's a fundamental question of liability. If we are right that she didn't fairly judge the importance of the 10 percent premium, then the question is, in a situation where no single action taken by the fiduciary or by the trustee amounts to any kind of a violation of ERISA, which of the four or five that she identified counts? Well, you know, you started out that way, and you started out your papers that way about no violation. But, in fact, this is a violation of ERISA, but there's a provision that says that you can get an affirmative defense. So this is all – there is – so let's talk about there's nothing wrong here. This is a typical case in that respect in that you have to make an affirmative defense, correct? Absolutely, Judge Motz, but it is in a very special circumstance. I think it's crucially important, and I think the Department of Labor ignores that, is that Congress intended to encourage ESOPs. Right. And specifically said – That's why you get the benefit of this affirmative defense. Right. But it's not just that you can – you know, if you can – it's not like I punch you, and then I'm going to put in a self-defense defense for it. It's not that I'm encouraging people to punch in order to be able to come up with a self-defense. It is because ESOPs are, in fact, an affirmatively economically good thing to have on both sides of the transaction that rules and rulings are not supposed to be adopted that are designed to create obstacles. And I assure you that the kind of flyspecking that the district judge entertained here to second-guess not only what the trustee did, but what the appraiser did in very specific ways, when all of that second-guessing doesn't tell you, what is it do I do in the next case? What question do I ask in the next case? Well, I'm not really sure that's true because I look at all of these cases, and they are – there are five or six cases that are sort of of a kind where the district court did – of course the facts are different, but the district court similarly found that the ESOP was not treated properly. Right. And ordinarily it's because there's something flawed in the process. I mean, you said this should be about procedure. Right. Isn't that right? Right. Absolutely. What are the key procedures? Hire outside counsel. Done. Hire an independent appraiser of unquestioned skill. Done. Give the independent appraiser all of the relevant information. Now, that's the one that if you read almost all of the ERISA cases, that's the flaw. They don't provide all of the relevant information. There's no question that that information is provided. He faulted you on the third point and make certain that reliance on the expert's advice is reasonably justified under the circumstances. Didn't he make that finding? I mean, that conclusion of law, frankly, I don't think it is a finding. It's a mixed question of fact and law as to whether on the facts of this case were we reasonably justified in following the advice of the independent appraiser. And, candidly, you shouldn't have to look any further than did this sell for exactly the price that the independent appraiser put it within the range of. And the answer is absolutely. Seven months later, they sold it for a number that was exactly within that price. Was the appraiser required to follow a prior appraisal? Actually, ERISA law will tell you that if the appraiser had simply adopted the McLean valuation and not made any changes, that would have been a violation of ERISA because that was stale evidence based on very changed circumstances. Did Wilmington ever look at the McLean? Who did? Wilmington, your client. Wilmington knew about its existence and Wilmington asked and did discuss the McLean valuation. Did they ever see it? Anybody at Wilmington ever see it? There's no evidence one way or the other about that. Yeah, I didn't find any, but I thought usually the parties know the record better than we do. So I just wanted to know. Nobody asked that specific question and he didn't offer up that specific piece of evidence. But what we do know is that the McLean valuation was in the data room. The McLean valuation was discussed with Mr. Golden. And the explanation for why the independent appraiser chose not to use it. I don't even have that. What I had was one of the people that were doing the SSR. El Taj. El Taj. Yes, said that there had been a previous valuation. That's all I've been able to find. Oh, no, he said that, well, Mr. Golden specifically said that he discussed it. Golden admits knowledge of a previous valuation. Mr. Golden said he discussed it with El Taj. El Taj specifically discusses the valuation. Yeah, he discusses it, but all I gleaned from the record, from the references you gave us, and maybe there are some others and I'll go look at it again, but, you know, it's a big record and you're going to put in the stuff that's worthwhile to you. All I got was that Wilmington knew that there had been a previous valuation. No, well, when I come back on rebuttal, I will give you the specifics. And they're in the brief, Your Honor. Can I ask a question about damages? Of course. What do you have to tell us about damages here? Well, obviously, if you pull out any of the threads of the sleeve on liability, the damages numbers change. But the biggest damages problem here is, again, goes to the 10% valuation for the control premium. Because that's a, depending on how you look at it, either an $8 million or a $17 million swing. It's at a minimum an $8 million swing because they have double counted how to deal with the problem of the control premium. All right. And if you do it correctly, it's actually a $17 million swing. And then the other one that's quite easy and is a layup is the beta. The beta number is a $3 million number. She admitted she was wrong about beta and then didn't change the damages number. So did you put in evidence about the beta? Yes, of course we did. Everybody testified to the beta. There was one offhand comment by one other witness. There was a Rule 36 witness who said something that was, I think, arguable one way or the other. But, no, there were a number of statements by the people in the business, El-Tash, describing what exactly the beta is. Well, I understand that she misunderstood. And do you have anything to tell us about attorney's fees before you sit down? You know, it's clear to me that there is no common fund once the plaintiffs receive their statutory attorney's fees. There's no room for the common fund at that point. Congress has determined what's a just and reasonable fee. I think that if you are asserting that they're claiming both, I don't think they are. I think they recognize, at least that's the way I read their papers when I asked them, they would either take the statutory award or take the common fund award. So is there a problem with that? No. Well, I mean, obviously, I don't think there's liability, so they're not entitled to the statutory award. You're not forfeiting that argument. But, no, I don't. I mean, they don't challenge the size of the statutory award. We don't challenge the fact of the statutory award above the fact that we don't believe that they're entitled to anything. On fees beyond that, that all comes out of the plan. So you don't, and there's no one here to challenge that right now. I don't have a dog in that particular fight, Judge Watts. Thank you very much. Thank you. Thank you. Mr. Porter. Good morning, Your Honors. Greg Reporter for the Appellant and Cross Appellee. I'm going to depart from the usual norm, and I actually want to respond to several comments made by Mr. Phillips. First of all, he made the point that there was no evidence that Wilmington failed to follow any professional standards of care. But let's not forget it was Wilmington's burden of proof to show the affirmative defense, right? They didn't put on an expert on the appropriate standard of care for an ESOP trustee in a case like this. In fact, in every other ESOP case I've ever done, which has been many, there's always an affirmative expert on the standard of care. No such expert here. So that's a failure of proof that's on them. Mr. Judge Watts asked several questions along these lines. Is this typical for an ESOP trustee to do it this way? She framed it as typical several occasions. Again, because Wilmington failed to put on an expert on what's typical and what the standard of care is, there's no evidence to support their affirmative defense. Well, maybe you can give us a little testimony about that, then, since you've done so many of these cases. Is it common to share the valuation? No, that's verboten. So, in fact, the district court found — Well, but I think your colleague on the other side made a fair point, that the company knows what it's worth. So by definition, they're going to all be in the same ballpark. It's precisely because the company knows what it's worth, and it's precisely because the sellers are desperate to sell the asset, and it's precisely because the sellers pick the trustee, that extra superdiligence is required, and that it's circumstances by the trustee to examine the assumptions and methods in the model and to question them. You just said it was verboten. What verbotes it? It is a violation of appraisal practice and standards to share your valuation model with the other side. Is there some statute that says that? There's no statute that says that, but Mr. El-Tosh would agree with me. Mr. El-Tosh would agree with me on that point, I'm sure. In fact, the district court found that Mr. El-Tosh shared his specific valuation model, under the guise of a hypothetical situation, directly with the selling side, even before he presented his valuation model to the trustee. That's not permitted. That's previewing. That's telling the other side where you're going to come in on price. That's completely improper. What impact, if any, does the fact that Academy was a competitor, and they really wanted this company, have on your case? Well, first of all, Your Honor, I think it's important to underscore with respect to Academy that the woman is just wrong when it said the trial court ignored the Academy transaction, devotes an entire page of its opinion to discussing Academy, and made specific fact findings. And here's what the court found. Number one, that Constellas and Academy were going to realize synergies of approximately $23 million. Number two, that the sellers were going to forgive $30 million of debt that Constellas owed to them. That's like money in the bank. Number three, that Constellas was going to get a tax refund worth $35 million. Again, money in the bank. You put all that together and subtract it from what Academy paid, and you get pretty close to what Mr. Messina's enterprise value was of Constellas. And that's exactly what the court found. So far from ignoring Academy, the court concluded, I think properly, that the Academy transaction, far from supporting stout valuation, undermined it. I think it's also significant to think about Wilmington's point that it was improper for the trial court to somehow second-guess or evaluate the stout valuation independent of Wilmington's process. That's just wrong. If you look at the cases, they all tell the trial court to look at the valuation, to probe it for substantive errors, to determine whether, in fact, the trustee reasonably should have questioned the valuation professional about it. Take the Henry case out of the Second Circuit, for example. I'm sorry to interrupt you, but I don't want your time. You know, it's important that we try to find out before your time expires. What do you have to say about beta? The district court made a mistake, acknowledged it made a mistake, and stayed with that finding. Right, Your Honor. So how could we possibly affirm that? Here's how, Your Honor. First of all, the district court acknowledged, in fact, that it misunderstood what beta was, but also pointed to the fact that it relied in part on that testimony on Mr. Golden, who himself misunderstood it, which tells you a little bit about the lack of familiar evaluation process of this trustee. But moreover, the court also found in her on the motion to amend decision, she examined beta and found it to be an unreliable valuation tool, if you will, subject to a lot of manipulation, which is what Mr. Messina testified to at trial, and decided that it was inappropriate to use beta. Now, there's a debate in the valuation community about the appropriateness of beta. Mr. Messina testified it's not appropriate. Mr. Tarble testified it is appropriate. The fact finder received the testimony of the expert witnesses and concluded that Mr. Messina was correct, and therefore decided to give the beta no weight at all, essentially, a beta of one, which doesn't change the numbers. But she initially had gone the other way, and then she – that's what I think the problem is. Right. And so we don't have a really good explanation for her second calculation, except that she wanted to keep the opinion the same. Well, I think she – I really have nothing to add to what she said in her second decision on the beta point and what I've already said, Your Honor. So the other thing I want you to be sure and talk about is attorney's fees. Okay. So I'm going to – if I could just have a moment on control, if you will. So my colleague mentioned that there were all these indicia of control, getting the reps and warranties, the indemnification, and then the $20 million out of the academy sale later on. Those are not indicia of control. The reps and warranties and the indemnifications were negotiated as part of the transaction. They were not indicia of control. They were obtained as a result of the transaction. Control is about the control of the company after the deal. It's not about negotiating deal points during the course of the deal. Second, the power that Wilmington exercised in connection with the academy transaction was the result of a new grant of authority. So in 2014, Constellas decides, oh, we want to give Wilmington this power. So it gives – it has a new document, a new grant of authority to be the transactional trustee for that transaction. That is not a power. That's not authority that Wilmington obtained at the time of the original ESOP transaction, and that's when control was valued, not six months later based on a new grant of authority. Okay, now I'd like to turn to attorney's fees. We believe that we're entitled to part of the common fund for two reasons. First of all, there's no prohibition under ERISA that prohibits the common fund award. I want to be sure I understand. You're not claiming both statutory fees and common fund fees? Not Dolores personally. We regard the statutory fee as the plaintiff's remedy, and then that's a partial offset against our common fund award. That's how we look at it. So we're not asking for the statutory fee plus one-third of the common fund. No. We view the statutory fee as an offset against our one-third. So if the court was to give us, you know, whatever, one-third of $9 million, the plaintiff's plan gets to keep the statutory attorney's fees. Did the district court really explain its legal and factual foundations for making this award out of common fund? We think it abused its discretion by failing to properly apply the Abrams factors, in particular ignoring the primacy of the contingency fee award, the contingent arrangement that this court recognized. Are you talking about our case? Yeah, Abrams. That didn't have any statutory fees in it. No. No, I agree with Your Honor, but I'm talking about the – I thought it was the Holy Grail until I actually read it. Judge Floyd asked me about the court's award from the common fund. I understand. And our challenge to its abuse of discretion in that regard. And Abrams governs the analysis in that regard. So we think the court abused its discretion by failing to fully account for the contingency nature of the arrangement, which this court has recognized as the primary factor under Abrams. In fact, I think the district court expressed hostility to contingent fees, where it said that clients and attorneys should not be co-investors in a lawsuit. That's directly contrary to the principle in Abrams, where this court recognized that a contingent fee aligns the interests of counsel and client. It rewards success and penalizes failure. It's the key to the courthouse door for people like Mr. Brondel. People like me aren't going to do this kind of work for contingent lodestar and no expenses. That's another thing that's important to recognize with respect to the risk of fee shifting statute. It only shifts fees and costs. That's statutory costs. So we got $1,500 in statutory costs for filing fees and the like. But we had $600,000 of expenses, almost all for experts. These cases can't be done without experts. And you weren't reimbursed for that? We were not reimbursed. The only way we get reimbursed is out of the common fund. Okay. I'd also like to submit that in considering certain objections by participants to the common fund fee award, the court erred. I'm not saying that it was improper to consider objections in the general sense. I think that was appropriate under the circumstances. But if you look at the specific objections that were made by participants, they're not really relevant under Abrams. And those objections consisted of we weren't aware of the lawsuit, we didn't hire the lawyers, it's my pension money, I don't want to pay any of it. Those concerns are always going to be present in a common fund situation. A problem for me, anyway, and maybe you can address it, is that this started out as a class action, and you never appealed to us. You let that go. That's gone. It's not a class action anymore. The district court denied it, right or wrong, it's gone. Well, we did appeal it to Your Honor, and you heard argument on that on the first round of this case a couple years ago when Mr. Halderson appealed this case. But he's the one that had the conflict, right? No, he's the one whose claim was dismissed because the court found he had released his claim. Okay, and that's what I was through. Right. And as part of that appeal, we appealed the class cert decision. Right. This court said during the hearing that, you know what, we're going to hold off on ruling on the first appeal because you guys are just about to go to trial, and let's see what happens at trial. Right. So the class cert issue remains on appeal and has never been decided. I thought that I read in these papers that it was gone now. Now, okay. We don't think it's gone. I know you don't think it's gone, but why might I think it's gone? Because it's a good to do a little preemptive strike here if you have one. Okay, so what happened was, and I'm trying to sort of remember back, I think we think it's still in the case because we think it's part of our cross appeal. Uh-huh. And I think, secondly, there's no law, although the law provides for a 23-F petition, failing to do a 23-F petition in the face of a denial of class cert doesn't preclude us from appealing that later. Right? So we're still allowed to appeal even if we don't file a 23-F petition. And I think that, you know, I think the question you asked about before us right now about this class action being still alive? I think it came up in defendant's papers. I don't think it came up in our briefing. All right. But we do think that it was an abusive discretion to deny a class cert and had the court granted a class cert, everyone would have had notice. Everyone would have known we were their lawyers, and all their concerns would have been addressed. I'm not sure. I think I'm out of time, Your Honor, so I'll reserve four minutes for rebuttal. Thank you. All right. Perry. May it please the court, Robin Perry for the Secretary of Labor as amicus supporting. Can you bring your little more petite than me? Yes, I thought that might be a little far. How's that? Perfect. There we go. The Secretary has an important interest in ESOPs and ERISA protection for participants, and here Wilmington is urging legal principles that are not correct. It's trying to push this court into a particular restrictive interpretation of ERISA that has contradicted decades of ERISA rulings. The argument is really challenging factual findings and the credibility of expert testimony as to these facts. They want to paint this as a special case because it involves ESOPs and ERISA and use that as an excuse to circumvent normal deference to trial court decisions. But this court and others have given the usual level of deference to district court decisions and ESOP decisions. Here the district court evaluated the credibility of expert witnesses and lay witnesses. This court held in Hendricks that evaluating the credibility of conflicting experts and the value of their opinions is a function for the district courts, and appellate courts should be especially reluctant to set aside those findings. And this court held in Cone Mills, in exactly this sort of finding, that a district court's findings of whether a fiduciary is justified in relying on appraisal can be overturned only when clearly erroneous. That's the standard used by this court. And this court in Kenny v. Quigg rejected the arguments raised by Wilmington about second guessing. This court held where district court explicitly said it was unwilling to second guess an independent fiduciary's stock valuation. I think it should probably be, I guess I feel badly about even saying this, but I guess I should be happy that the United States government agency is urging deference to a court. It's normally the other way around. But that being the case, just tell us, what are you protecting the plan participants from in an ESOP context? What exactly are you protecting them from? Yes, Your Honor. In terms of this? ERISA sets stringent requirements for what a fiduciary should be doing. So this is compensation. The ESOP is part of their compensation, and that should not be drained. Fiduciaries are not supposed to do a deal if they don't have an asset worth the cost. They are supposed to be prudent. They are supposed to put the interests of the participants first, and they have to evaluate the conditions of the transaction. So you mean that if the employer's company is not valuable enough, they shouldn't have an ESOP? If it is determined by the employer that they want to have an ESOP, then a trustee is the steward of those funds for the participants. No, that wasn't my question. My question is, is it a situation where an employer's company is too low? It can't afford the value? Because you said you're trying to protect them. What is the protection? I'm not sure if I quite understood your question, Your Honor, so tell me if I'm not addressing it in the way you're asking. A company can decide that it wants to have an ESOP as part of compensation to encourage workers to want to work there. It's part of their labor that is being recompensed. And once they have set it up as a plan with a trustee, a trustee has the highest duties known to law to protect those plan assets that belong to the participants. That's what I'm talking about protecting. But this is actually in the formation we're trying to protect them, right? Not going along. They didn't keep it long, like seven months. It's not at the moment of creation when the employer decides to create an ESOP, but it's when there's a transaction. Right, post-creation when there's a transaction. Yes, so once there is that creation, once it has been created and there is a transaction, those are assets, and the trustee has to be a careful, prudent steward. This is $200 million of plan assets that belong to those participants. $48 million was put in in cash as a contribution. That money belongs to the participants. And for that money then to be not treated carefully, for a fiduciary not to look at all of the underpayings of evaluation to see if they're getting the value for what they're paying. They're paying $200 million to get 100% of the stock. It's a grave responsibility to help protect these funds for their retirement. And Wilmington is trying to loosen these standards and saying, well, you have an expert, you rely on the expert, that's all you have to do. You don't have to look beyond that. And the district court shouldn't look beyond that and shouldn't second guess. When they look, what should they have found in the clear face of it? What actually did they do wrong? So this court looked at a similar case in Kenny v. Quigg. And the district court there said, well, I shouldn't second guess the valuation judgments. And this court said, no, you have to look at the bases for the valuation. So in that case, Mellon Bank, the district court said, I'm not going to look at this. And the Fourth Circuit said you should have decided whether, for example, Mellon Bank improperly relied on its own valuation of company stock. You should have looked at whether they should have sought out offers for the stock in the market, whether they should have included in the valuation amounts paid out as dividends. This is all the kind of scrutinizing the bases for a valuation that Wilmington says the brundle judge shouldn't have done, that it was hindsight, that it was second guessing. But this court said, no, you're obligated to do that. The district court is obligated to review that. And Wilmington didn't even address this binding precedent. The reason that we require the trustee, well, we have a risk of period. But beneath all this, the conflict between this huge tax advantage that the employer is going to get and the benefit to the employee and arguably in the employer's mind, this is just, they're a free rider. This is something we're giving them. We didn't have to give them. And the employee says, no, this is my pension plan. I earned this. It's not wages, but it's my labor that got this. Is that the conflict that we're trying to, you know, back to Judge Gregory's question about who are we protecting from what? Yes. So the employer's argument that this is just a gift, that's been rejected in court after court. It's called the gift theory. And courts have said, no, it is in fact. There's tons of precedent on this. There was a testimony that one of their witnesses along the way had said that. Anyway, go ahead. Wellington is making that argument, but it's an argument that's been rejected time and time again. So Congress said when they set up ERISA that an employer or another party in interest selling SOC to an ESOP could be tempted to do it primarily for its own benefit rather than for the benefit of participants and beneficiaries. And the price could be too high, so plan assets could be drained off. So Congress expected, these are all in the House reports at the time, that all aspects of these transactions will be subject to special scrutiny by the DOL and IRS to ensure they're primarily for the benefit of the participants and beneficiaries. And that's why a trial court properly scrutinizes the process the trustee used to determine fair market value and doesn't give deference to the trustee or its advisors. Mr. Perry, I know you don't have much time, but going forward in terms of this, this issue here is a friend of the court, and so we want our friends to help us. Policy-wise, as Mr. Phillips said, wouldn't it be very treacherous for independent fiduciary appraisers to engage in these ESOPs in the future if what it takes is to go and have litigation and the judge say, well, you know what, I think the plaintiff's expert is better, smarter, or whatever you want to call it, more credible or whatever. And then it all goes in terms of damages to this level because there's another expert who says something different. That's Wilmington's argument. I know that, but that's what I'm saying, but what do we do in terms of, don't we have a bit of that here? No, Your Honor, this is the same standard that's used for decades in other circuits, and it has not driven trustees out of the marketplace. It's been used in Hall Holding. It's been used in Bucion. It's been used, so the Fifth Circuit, the Ninth Circuit, I believe, the Sixth Circuit. If you don't hold plans to a high standard, there can be a flight to the lowest common denominator, and if the mere presence of advisors in these transactions justify deference, that would insulate every large plan transaction because it is routine to have advisors. It would leave the plan unprotected. It would eviscerate ERISA's protections. Of course, fiduciaries can get advice from experts, but they have to look at it. The decision is ultimately theirs. It's not a blank check. As another court has said, it's not a magic wand. It doesn't insulate them from looking at it themselves. Someone making a $200 million decision should be looking at the appraisal in detail to be making sure they're spending the money wisely. That's what they would be doing if it was their money at stake, and that's what they should do when it's the participant's money at stake. Can I ask you, taking all that as correct, why the Department of Labor didn't bring an enforcement action here? Your Honor, I can't speak to the possibility of – I can't speak to investigations. Are investigations still ongoing? I can't speak to that. You can't tell me if they're ongoing? Right. We don't confirm or deny if investigations are ongoing. There was an investigation. We know that from this record. Yes, Your Honor, but we don't confirm or deny. How can that be in the record and you can't tell me this now? So somebody, the Department of Labor, at some point let that out, right? Yes, Your Honor, but once an investigation is ongoing, we don't confirm or deny if it's still open. Do you tell – is it like targets? Do you tell somebody after the fact that the investigation is over? Yes, Your Honor. So would you be free to tell us if the investigation – If we had informed the target in the investigation that it was closed, I could, I believe, confirm that. Okay. So can you give me an idea of how unusual or not this transaction is, particularly with the apparent sharing of the valuation? Maybe it's unusual but maybe not because ESOP transactions, they're always, you know, of an unusual nature. I can say that it's extremely unusual for 100% of the stock to be given to one side and yet for that side not to have control, not to have the authority to make any decisions, not to be able to block the sale of the company, not to be able to have a majority on the board. Yeah, I think the experts testified that that was unusual. Yeah, yes, Your Honor. What about the timing? Was that unusual? It was extremely short, I will say. I can say that. It was done in a day, Wilmington's review, and the focus is on the trustee, not on how long the appraiser had to review it but on how much time the trustee spent. Did they have enough time here? The court found, as a matter of fact finding, that this was rushed and that they did not even review all of the details. They did not ask questions. They didn't ask a single question about control. They didn't review the McLean report the court found. In fact, they didn't even know who had done a previous evaluation, just that there had been one. Well, you heard the questions and you've looked at the record and you think that's true? Yes, Your Honor. Yeah, your colleague said that was not so. So what do we make of the fact that the IRS has now approved the transaction? Your Honor, we can't speak on issues relating to a separate agency. I'm sorry. Okay. I don't know that that is sort of like asking you to interpret a case and you telling me I can't speak with. It doesn't affect whether or not the trustee acted prudently in this case, which is the issue, whether or not adequate consideration was made. So you could get IRS approval even if the trustee had not acted prudently? There's certainly cases that have been reviewed where a case where a plan was tax qualified and courts looked at whether or not the trustee had behaved prudently. That is certainly not the be-all and end-all. And concluded the trustee did not act prudently? Yes, Your Honor. Okay. Thank you. We ask that the court affirm the conclusions on the issues that we presented. Thank you, Ms. Bair. Mr. Phillip. Thank you, Your Honor. I'll try to be brief. First, Judge Motz, I want to be clear that there were, to be sure, exchanges between the parties with respect to the range of the, we never, there is no evidence whatsoever that the trustee actually handed the appraisal to the other side. It was just that once they made their bid and we made our bid. Wasn't there testimony about a hypothetical that included the actual valuation? There was a discussion of hypothetical range, but that's a vast difference between having it. Right. But, again, I mean, to my mind. Okay. I mean, in question whether it was cozy, then the ultimate issue is what are the damages that flow from it if you end up with a midpoint of a range that was within the, if you otherwise accept the valuation as being absolutely perfect, the fact that you end up at essentially the midpoint of that valuation would suggest to you that it's a perfectly reasonable way to proceed. On the question of what the company knew, what the trustee knew, and what the outside evaluator told them, this is on page 26 and 27. You said you didn't think we'd say enough in the record, but this is in the brief. El Toch, quote, let Greg Golden and the other members know that the company had previous valuations performed for financial reporting and tax reporting purposes, and that he had determined that it was not an accurate data point in the company's fair market value at the end of 2013. Golden then understood that there's prior valuations, and it was determined that they were not relevant. Right. I thought that's what I read to you earlier. But, anyway, go ahead. Anyway, that just suggests that they knew about it. It was conveyed to them. It was explained. Now, I suppose you could argue about, well, should there have been a longer conversation about that between Golden and El Toch? But it seems to me you have to understand this in the context. You're talking about an independent trustee who is supposed to be able to rely on the expertise. And what did the expert say? He said it's stale data, it's on a very different valuation purpose, and it ignores a $60 million debt repayment that had already been made and ignored the fact that all of the comparator businesses had improved their share of value by 30% to 35% between the time of that valuation and the time of the one that's under review in this case. Candidly, if the circumstances had been different and all of those facts had gone the other way and the numbers had dropped and we had used the McLean value, we would have been liable under the case law that says you cannot rely on stale data. So it's perfectly understandable that we wouldn't have relied on that under these circumstances. The Department of Labor says this court has said that there's a duty to do certain things in terms of how you evaluate various types of issues. I have two things to say to the Department of Labor. First of all, they've had 40-some years to give us a checklist of what they think goes in to determining fair market value or what they want either independent appraisers or independent trustees to do, what questions they want them to ask. They've abdicated those responsibilities. That statute, by its terms, says act in good faith and follow the DOL's regulations. To this day, we don't have DOL regulations. Proposed regulations or some such. Proposed regulations. But the truth is to come in here and complain after the fact that we could have done more or better and not take the time and put in the energy to actually adopt a set of regulations that tell us what to do, that's the importance of realizing we're talking about a company acting in good faith. If you had said to us these are the things you need to do, these are the boxes you need to check, we wouldn't be in this particular problem. Judge Motz, you asked about the beta. There is no answer to that. That's clearly an error. There's no way you can just paper that over. It's in this case. It's been in this case. The damages have to be reduced by that much. And ultimately, aside, with respect to the class action issue, just to tell you our side of that, Halverson wrote a letter to the court withdrawing the issue. That was the prior plaintiff who came up on appeal. He had a class action issue up there. He withdrew it. That's what I thought. And so that was the basis for our motion saying that issue has been up there, come and gone, and it's no longer in the case. And then I thought it was withdrawal. Yeah, he withdrew it. Right. He formally withdrew it. So was there another class action? Well, in their cross appeal seeking more money, they said, oh, and by the way, you know, we think this ought to be regarded as a class action. But by that point, it's way too late. Okay. In the district court, there's the complaint. Was there a request for class action? Yeah. Yes, I'm sure there was. But that was with Halverson. It would have been Halverson, and it would have been the amended complaint as well, I suspect. Okay. So it wasn't pursued in the district court? I'm sorry? It wasn't pursued in the district court, the class action? Right. The district court denied class certification. But that was with Halverson. Right. Same counsel. Yeah, I understand. And then the Halverson thing goes away, and then they don't go back to the district court after that. Right. Okay. Let me just say in closing with respect to the control premium, I mean, at the end of the day, the suggestion that somehow that control premium wasn't significant is belied by the fact that $20 million of money was extracted from the transaction, from the sale to Academy, specifically to the ESOP. That's $20,000 to each individual member of the ESOP, at least $20,000 to Mr. Brundle in this specific case, and only because the trustee was able to exercise the authority to say, I'm not giving you my shares if you don't make concessions under these circumstances. So the idea that there's an absence of control in that circumstance is wrong. And if the Department of Labor wants to say that there is no control power and no premium to be had under these circumstances unless you get a majority of the board, the solution to that problem is adopt a regulation that says so. As matters stand now, it is standard appraisal methodology to say there are multiple factors of control, one of which is control of the board, another of which is the ability to modify the terms of a sale. The decisions below should be vacated and remanded back, Your Honors. And no further questions. Thank you for your time. Thank you. Mr. Porter, you have some time. Briefly on the McLean report, the testimony is that Mr. Golden was aware of the existence of the report. He got some explanation from Mr. Eltash about it, but he didn't ask to read it. He didn't ask to see it. He just took Mr. Eltash's word for it. The trial court found that that was a failure of process because the trustee should examine a prior evaluation to determine whether it had any bearing on the valuation at hand. It's not our position that the McLean valuation should have been swallowed hook, line, and sinker by Stout. Our position is that the trustee should have looked at it and compared it to see if Stout was doing anything materially different or wrong, and if so, why? Moreover, the CFO of the company, Mr. Magnani, testified there were no material changes in the company's financial circumstances between the McLean valuation and the Stout valuation several months later. So it wasn't that stale evaluation. It was only several months old. I think sort of turning back to the question you asked, Judge Gregory, is what exactly are we protecting here? What we're protecting here is the compensation of individuals who have made a bargain with their employer. The employer said, we are going to provide you with an ESOP, and we're going to hire a trustee who's going to do its utmost due diligence to make sure that the ESOP doesn't overpay for the asset. Because if the ESOP overpays for the asset, it takes that many more years for the debt on the asset to be paid down by the ESOP. It takes that many more years for the shares to be released in the accounts of individuals. Every year of service gets more shares. So you extend the time horizon by an overpayment that's more interest the ESOP has to pay, and that's more years of service you have to get for your deferred compensation. So that's what you're trying to protect is to prevent the employees from overpaying for an asset. And what you're also trying to prevent is some of the moral hazards that arise on the sell side. Remember that the seller gets to pick the trustee. The seller had approval over the financial advisor that the trustee selected. Moreover, the seller has massive tax benefits under the tax code for this kind of transaction. If it rolls its money over into like property, as they did here, no taxes whatsoever. Zero. Hundreds of millions of dollars in transaction. No taxes. So that's in part also why we're trying to make sure that the trustee does its job. Finally, Mr. Phillips pointed to the fact that there were no findings of conflicts in this case, but that's also just not true. To be sure, there was no finding of breach of duty of loyalty, but the court had no need to go there because it was a defendant's burden of proof as to adequate consideration. So here's what the court found with respect to conflicts. It found that over 50% of Wilmington's ESOP business was referred by CSG. It found that Wilmington had never turned down a CSG deal. It found that Stavrisius had worked on over 14 of these CSG deals. It found that the company management that was supplying the projections was going to get a 5% cash bonus based on the sales price. If that's not an incentive to inflate the sales price, I don't know what is. So as a result of these conflicts lurking in the background, that in part informed the totality of the circumstances that led the court to believe that Wilmington failed to fulfill the standard of care. Finally, I want to say that as this court said in the Godley case and other cases, fair market value is a question of fact that can only be reversed on appeal where clearly erroneous. That necessarily means the court has to look at the valuation model to determine the fair market value. You can't review a court's findings with respect to fair market value as being clearly erroneous unless the court looks at those findings and looks at that valuation and makes the findings that the court commands. So it was not intrusive to do what the court did in terms of looking at the substantive errors because without probing the substantive errors, you can't probe the trustee's failure to identify and locate the substantive errors. And if you actually look at the court's opinion, it's full of findings of failures of process. Negotiated the $200 million deal in a few hours. Gave away millions of dollars in rounding up. Didn't ask to see about prior offers to buy the company. Failure to question and probe management projections. Some committee members didn't even attend the meetings where they voted on the deal. Some committee members didn't even read the valuation report. Those are findings of fact that go to failure of process. Finally, and I can't believe we waited this long to get to it, Mr. Golden, the point person on the deal, their 30B6 witness testified at trial, we don't do real world buyer due diligence. That's it. They admitted it. They don't do what? Real world buyer due diligence. The test here is what would a hypothetical prudent person do with $200 million worth of retirement money to spend on a company? Mr. Golden admitted we don't do what the real world buyer does. We don't do what the hypothetical prudent private equity buyer does. We don't do any of that because we get some kind of super duper indemnity or something like that. There's no expert testimony on whether their indemnities are super duper or their warranties were super duper. And there was no testimony from any expert proffered by the defendant on the proper standard of care. That was a failure proof on their part. It wasn't an error of the district court. Thank you, Your Honor. Thank you. We'll come down and greet counsel.
judges: Roger L. Gregory, Diana Gribbon Motz, Henry F. Floyd